# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

CROM, LLC,

      **Plaintiff,**

v.                                    **CASE NO. 1:16cv238-MCR/GRJ**

PRELOAD, LLC and
PHUONG BACON,

      **Defendants.**

_____/

## ORDER

Plaintiff Crom, LLC ("Crom") filed this suit against its former employee, Phuong Bacon ("Bacon"), to enforce a Non-Compete Agreement and for damages caused by Bacon's alleged breach of the Agreement and breach of her common law duty of loyalty (Counts I and II).[1]  Crom also pled claims against Bacon's current employer, Preload, LLC ("Preload"), alleging tortious interference with Crom's business relationship with Bacon (Count III), civil conspiracy (Count IV), and unfair competition (Count V).  The claims all stem from allegations that Bacon misappropriated trade secrets and confidential information when she went to work

---

[1] Diversity jurisdiction is satisfied.  *See* 28 U.S.C. § 1332(a).  Crom is a Florida limited liability corporation, and its sole member is Crom Holdings, LLC, a Georgia limited liability company.  Preload is a Kentucky limited liability corporation and its sole member is Caldwell Tanks, Inc., which is a Kentucky Corporation with its principal place of business in Kentucky.  Bacon is a resident of South Carolina.

for Preload, Crom's competitor. Pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 59, and Motion to Strike affidavits pertaining to damages.[2] ECF No. 65. Having fully reviewed the matter, the Court finds that the Motion for Summary Judgment is due to be granted in part and denied in part, and the Motion to Strike should be denied.

## I.   Background

Crom builds prestressed concrete tanks ("PCT") to store liquids, most often water or wastewater. According to Stephen Crawford, Crom's Vice President of Engineering, Crom uses standard industry design specifications titled AWWA D110 and ACI 372, and Crom primarily builds what is called an AWWA D110 Type II tank, to which ACI 372 criteria applies.[3] Although Crom's basic design and construction process is publicly available on its corporate marketing brochure, ECF No. 60-1, at 28-32, 41, Crawford testified that Crom's "internal design procedures" and expertise from a design standpoint are what distinguish Crom from other

---

[2] Crom requests oral argument, but on review of the file, the Court has determined that the motions can be resolved without oral argument. The summary judgment motion had already been pending for over ten months when the case was reassigned to the undersigned. The matter is fully briefed and submitted, and the Court finds no reason to hear oral argument.

[3] Industry standards developed by two governing bodies, the American Concrete Institute ("ACI") and American Water Works Association ("AWWA"), whose members are competitors in the industry, guide the design of PCTs.

companies. *Id.* at 65. He knows of only four companies competing in the United States in the PCT market—Crom, DN Tanks, PreCon Corp., and Preload. *Id.* at 125.

Preload, the competitor involved in this suit, bids against Crom for PCT design and construction projects in the Southeastern United States.[4] In addition to its PCT work, primarily designing AWWA D110 Type III tanks (to which ACI 372 criteria applies), Preload is developing another tank design—a Liquefied Natural Gas ("LNG") storage tank. It is undisputed that Crom does not build or design LNG tanks, and that LNG tanks are subject to a separate industry design code. *Id.* at 131-132. However, an LNG tank can be built with a PCT (prestressed concrete) option, and in that instance, Crawford said the code requires the LNG tank to be designed in accordance with ACI 372 specifications, which are also used in PCTs. *Id.* at 130 (Crawford explained, "thus, a 372 tank design is an LNG tank design"). Crawford maintains that an LNG tank designed with prestressed concrete cannot be designed "per the code without designing it as an ACI 372 tank, and that is what Crom Corporation specializes in." *Id.* at 131.

Bacon worked as an engineer on Crom's PCT design team, most recently under the supervision of Stephen Crawford, from September 2007 through March

---

[4] The record reflects that "Preload was the inventor of the prestressed concrete tank," and "J.M. Crom was one of the developers." ECF No. 60-6, at 159-60.

2016. Bacon gained all of her experience and specialized knowledge regarding prestressed concrete and PCT design from Crom. At the end of March 2016, she left to work for Preload on its design of LNG tanks using prestressed concrete. Her new boss at Preload, K. Ryan Harvey, had previously worked for Crom as Vice President of Engineering, and was aware of her Non-Compete Agreement with Crom.[5]

Crom filed this suit in June 2016, after Bacon went to work for Preload. Crom alleges that Bacon's employment with Preload violates her Non-Compete Agreement with Crom, which she signed when she began working as an intern; that Bacon misappropriated Crom's trade secrets and other confidential information when she went to Preload; and that Preload encouraged the breach, interfering with Crom's business relations in order to gain an unfair advantage in the PCT market. In defense, Preload asserts that the Non-Compete Agreement is not valid or reasonably related to Crom's legitimate business interests in the PCT industry, that there is no evidence that Bacon misappropriated trade secrets or confidential information, and that there is no evidence Crom was damaged by any perceived

---

[5] Harvey left Crom on November 10, 2011, to work for Caldwell Tanks, Inc. Crom sued Harvey and another former Crom employee in 2012 for breach of their noncompete agreements with Crom because Caldwell was a competitor. *See Crom Corp. v. Harvey*, No. 1:12cv141SPMGRJ, 2012 WL 13018540, at *4 (N.D. Fla. Nov. 29, 2012). The case settled in 2013. In February 2015, the majority shareholders of Caldwell purchased a controlling interest in Preload, and Harvey became Preload's Chief Executive Officer ("CEO").

unfair advantage in the PCT industry or loss of profits as a result of Bacon's or Preload's actions. The facts relevant to these disputes are set out in greater detail below.

The record reflects that on September 24, 2007, while an engineering student, Bacon accepted a paid internship with Crom in its Gainesville, Florida, office. ECF. No. 59-1. The offer stated that she would be paid an hourly wage and would "work part time as an intern during [the] semester." *Id.* Within a few weeks of her employment, Bacon signed a Non-Compete Agreement, promising to not disclose Crom's trade secrets or confidential information during or after her employment (¶3), to return all of Crom's documents and records, including her work, upon her termination (¶4), and to not seek employment with a Crom competitor for a period of three years, "commencing with the date of the employee's termination with Crom" (¶5).[6] No. 59-2. Harvey, who at that time worked for Crom, signed Bacon's Non-Compete Agreement on behalf of Crom.

---

[6] More particularly, the terms at issue in this suit required the following:

3. The Employee shall not, during his/her employment with [Crom] or thereafter at any time, disclose to others or use for his/her own benefit any trade secrets or confidential information of any technical, commercial or other nature, pertaining to any of the present or future business of [Crom], knowledge of which was acquired by or became known to the Employee during the period of his/her employment with the Company . . . .

4. Upon termination of the Employee's employment with [Crom], the Employee shall turn over to [Crom] all notes, memoranda, notebooks, records and

Bacon graduated with a Master's in Engineering in May 2010. On April 7, 2010, Crom offered her employment as a full-time Staff Engineer at its Gainesville, Florida, office, beginning May 15, 2010 (the 2010 Offer letter was revised on May 12, 2010).[7] This 2010 Offer was contingent on a successful background screening and drug test and required Bacon to obtain licensure "within four years of her start date." ECF. No. 59-3. The 2010 Offer stated she was required to sign a Non-Compete Agreement on accepting the contingent offer. *Id.* Bacon accepted the 2010 Offer, but was never asked to execute another Non-Compete Agreement.[8] Over the

---

any other documents and reproductions thereof kept by the Employee or in the possession of the Employee . . . used or pertaining to any activities of the Company (including but limited to the work done by the Employee during the course of his/her employment) . . . .

    5.    The Employee shall not seek to obtain employment with any competitor of [Crom] engaged in the present or anticipated business of [Crom] . . . for a period of three (3) years commencing with the date of the Employee's termination with [Crom].

ECF No. 59-2. The agreement also includes a severability clause, stating if any portion is found to be unenforceable, the remaining paragraphs are unaffected and must be interpreted on their own merit.

[7] The 2010 Offer letter further stated, "upon acceptance of our offer you would begin with our company as a Staff Engineer." ECF No. 59-3. Crom stated it appreciated Bacon's work as an intern and, based on her work, it was offering her a "contingent offer of employment as a Staff Engineer in our firm." ECF No. 59-3. The letter advised her of the starting salary and that benefits would begin to accrue as of her "first day of employment." *Id.* Bacon's health benefits enrollment application identifies her "Date of Hire" as May 17, 2010, and her effective date of coverage as July 1, 2010. ECF No. 59-6.

[8] Crom characterizes Bacon's new full-time Staff Engineer position as a "promotion" or "continuation of employment." Bacon's employee ID number, 1341A, remained the same, and she was "promoted" to a full-time salary and benefits. Megan Marquis-Torres, HR Supervisor at Crom, acknowledged in her deposition that she had received "a request to add [health] coverage

years, she received promotions from staff engineer to Engineer II (in 2013), and to Engineer III (in 2015). In 2013, when Bacon's husband obtained new employment, she and her family moved to South Carolina. Crom permitted Bacon to work remotely from her home office in South Carolina and provided her with equipment for her work, including a Crom computer and monitors, external hard drives, and USB flash drives.

While employed by Crom, Bacon worked on its PCT design engineering team, and Crawford, her supervisor, testified that she was dependable and hard working. Bacon primarily worked on design projects located in Tennessee, Georgia, North Carolina, Florida, Kentucky, Alabama, Virginia, South Carolina, Mississippi, Louisiana, and Puerto Rico. ECF No. 60-1, at 88-8. As a team member, Bacon prepared designs and drawings for "two-dimensional and three-dimensional structures, one-way and two-way slabs, plate and shell structures, scaffold and shoring formwork, and prestressed elements using single wire and strand."[9] ECF No. 60-1, at 76-77. In addition, she had access to computer design programs that

---

for a new full-time employee to be effective 7/1/2010," referencing Bacon, but Marquis-Torres corrected her deposition to reflect that Bacon was "promoted" and "was not a new employee. It was a continuation of employment." ECF No. 59-5, at 5.

[9] Crawford testified that Bacon was not the engineer of record for any design, was not involved in marketing or sales, and did not prepare bid estimates or negotiate contracts with customers. ECF No. 160-4, at 79-81.

Crom considers confidential, proprietary business information, as well as trade secrets. Bacon helped develop a "dome form program" and had access to other design programs, including "C Pile [which] is a pile floor program, and C Note," which Bacon agreed are Crom's confidential information. ECF No. 160-4, at 60.

In 2015, Bacon began searching for a new job. She contacted Harvey, her former boss at Crom and then-CEO of Preload, in December 2015 to ask whether he would serve as a reference for her, and he agreed. In February 2016, Harvey contacted Bacon to ask whether she would be interested in a position at Preload, which he said would be challenging and was not related to her work at Crom. ECF No. 60-4, at 66. In early March 2016, Bacon traveled to New York to interview with Preload. The job would involve designing LNG tanks, and the job description stated that the analysis and design of prestressed concrete tanks would be essential to the job. Bacon testified that during her interview with Preload, however, she learned there would be many other things she would need to learn in order to perform the LNG job. On March 11, 2016, Harvey emailed Bacon an offer for a position designing LNG storage tanks "for projects in the Northeastern United States." ECF No. 59-14.

On March 21, 2016, Bacon personally delivered her letter of resignation to Crawford, giving four weeks' notice. ECF No. 59-17. Bacon disclosed her job

offers to Crawford, who advised her that she could not take the Preload offer because of her Non-Compete Agreement with Crom.[10] She requested a copy of the agreement and ultimately determined that her work at Preload, as explained to her by Harvey, would involve only the design of LNG tanks, so she would not be in competition with Crom. Bacon testified that Harvey agreed with her assessment, ECF No. 60-4, at 113, and she accepted the job because she did not believe that Crom and Preload were competitors in the LNG industry, ECF No. 60-4, at 170.

When notified of Bacon's decision to take the position at Preload, Crom advanced her final date of employment to March 25, 2016, and dispatched an IT employee, Alex Barrio, to Bacon's residence in South Carolina to retrieve Crom's equipment and to search for Crom-related files on her personal computer. Prior to Barrio's arrival, Bacon had gathered together Crom's property, downloaded and transferred what she thought were her personal files to a flash drive and made copies of Crom's files for a backup on Crom's drives. She allowed Barrio to inspect her personal computer. According to Bacon, she told Barrio that she also had the personal flash drive, in addition to her personal computer, and that he was welcome to search it, but he declined. Barrio did not recall this. *See* ECF Nos. 60-4, at 130-

---

[10] Bacon also had been offered a position on March 18, 2016, from Savannah River Remediation, an affiliate of AECOM, which is not a Crom competitor.

131; 60-8, at 13-14. Barrio testified by deposition that he found no Crom-related information on Bacon's personal computer and that she was cooperative throughout the collection process.

Crom subsequently hired a forensic consultant to search the equipment that Bacon had used in her work to determine whether she might have taken confidential or proprietary electronically stored information belonging to Crom. The consultant was tasked to identify and restore deleted files and identify and examine the file activity, external devices connected the computer, and emails sent and received between November 2015 and March 25, 2016, which were the final months of Bacon's employment with Crom. The forensic report dated May 23, 2016 ("Report") examined four hard drives and determined that there were well over 100,000 files in each of their directory listings. The Report identified the numbers of times files had been "accessed" during this time period, which was less than 100,000 total, and most (86,491) had been accessed in a MyPassport external hard drive during the month of March 2016.[11] ECF No. 60-7. The Report also noted that

---

[11] The Court has not been given the benefit of an expert affidavit or deposition testimony to explain Crom's forensic Report, which examined the equipment Bacon turned in when she left. Throughout Crom's argument in response to the motion for summary judgment and when counsel questioned witnesses in depositions, Crom's counsel made statements that Bacon "accessed and downloaded" or even that she "absconded with" "hundreds of thousands" of files from November 2015 through March 2016, but this assertion is not substantiated by the Report itself or any other evidence. The Report noted that several hundreds of thousands of files existed on the hard drive

a USB mass storage device, a printer, and a phone had been externally connected to Crom's hardware during this timeframe, which would allow the copy or transfer of files. However, the Report does not identify any link between the files "accessed" and those externally connected devices. ECF No. 60-7, at 10. In fact, the Report "recommend[ed] that further forensic analysis be conducted in an attempt to link the external devices to the accessed files," given the large number of files accessed during March 2016.[12] ECF No. 60-7, at 10.

Shortly before filing suit, Crom's attorney notified Bacon and Preload that Crom believed Bacon was violating her Non-Compete Agreement and that Crom had "discovered forensic evidence confirming Ms. Bacon's misappropriation of Crom's confidential information prior to her resignation," by copying files onto mass storage devices. ECF No. 60-9, at 2. Despite the fact that the Report by Crom's forensic consultant had not identified a link between any of the files "accessed" and the external devices or conclude that any file had been taken, Crom's attorney

---

directories examined, that many of them were "accessed" during the relevant period while she was an employee, and that three external devices (a USB, a printer, and a phone) had been connected to her work computers. It did not express an opinion that any files in fact were downloaded or transferred to the external drives but instead recommended further analysis. ECF No. 60-7, at 10.

[12] The Report also generally recommended that Crom's IT should install tracking software and file audit software to allow its IT Department to track documents that are accessed, modified, printed or deleted. Apparently, Crom did not use any such tracking software.

accused Bacon of having "accessed and transferred" files including Crom's tank list, project history, corporate structure descriptions, and employment files, among others, and requested that Bacon and Preload preserve all documents and electronically stored information that they might possess regarding this litigation.

Bacon then examined her files and discovered that some Crom-related files had been saved with her personal files. She provided three personal storage media devices to her attorney, who had them imaged and indexed by a forensic data consultant before returning them to Crom.[13] Bacon's attorney sent a letter to Crom in which he explained that Bacon had "inadvertently retained some Crom-related files," and noted that that the contents had been examined and indexed by a forensic consultant. He further advised Crom that Preload's consultant had deleted from these devices some files that Bacon identified as personal before sending them to Crom.[14] Also, the letter noted that one Crom-related file, consisting of a list of Crom engineers, including Bacon, and the dates of their licenses, was located on her Preload laptop, but no other Crom files were present. ECF No. 60-10. Bacon's

---

[13] The Court does not have the benefit of this forensic report or index.

[14] Counsel also informed Crom that a list of the personal data files that were deleted was available, if needed. ECF No. 60-10. Crom accuses Preload of deleting potentially confidential Crom-related information.

attorney shipped the files to Crom in March 2017. Crom has not presented any affidavit or testimony regarding the content of those files.[15]

In her deposition in July 2017, Bacon admitted having discovered during this litigation that she had downloaded some Crom-related files before she left Crom, which she found with her personal files. She explained that she was previously unaware of them and must have copied and saved them inadvertently; she denied downloading Crom's confidential programs. ECF No. 60-4, at 59, 131-141, 158-161. Bacon testified that she believed she was transferring personal files but also said that she had transferred some files to create backups for Crom. *Id.* at 158-59.

Bacon also testified that her work for Preload was limited to research and design of LNG storage tanks using prestressed wire-wound concrete. She said she worked on one LNG tank project in Pennsylvania and one in Alaska. Harvey, Preload's CEO, confirmed that thus far, Bacon's work was limited to these projects. He testified that, although Preload has placed no geographic work restrictions on Bacon's work, she is restricted to the design of LNG storage tanks. Harvey denied

---

[15] Crom has possession of Bacon's personal data storage devices and these files but has provided no affidavit or deposition testimony to confirm that any particular file she transferred to a personal device in fact was confidential or a trade secret. Instead, there is only questioning by Crom's attorney, asking Bacon at her July 2017 deposition whether she would be surprised to know that "over 108,000" files that she downloaded were "exact matches with confidential information located on Crom hard drives." ECF No. 60-4, at 135-136. This is not evidence.

CASE NO. 1:16cv238-MCR/GRJ

instructing Bacon to download or transfer any materials from Crom and stated that, to the contrary, he had instructed her to ensure there were no items brought to Preload. ECF No. 60-6.

During discovery, Crom identified its damages as lost profits from being outbid by Preload on two PCT projects since Bacon's departure on March 25, 2016.[16] Specifically, Crom referenced a project at Rainbow City, Alabama, which resulted in $286,752 in lost profits as a result of Crom being out-bid by Preload, and Crom claimed $382,491 in lost profits from losing a project to Preload in San Antonio, Texas ("Montana Pass"). ECF No. 59-26. Each project involved the design and construction of water storage tanks specified as AWWA D110 Type II or Type III wire-wound circular PCTs. Defendants presented evidence in support of summary judgment showing that Preload's winning bids for these projects could not be said to have caused Crom's damages because Crom was not the second lowest bidder on either project and thus would not have won the projects even if Preload

---

[16] In ruling on a motion to compel, the Magistrate Judge noted, consistent with this understanding, that "Crom is not claiming damages related to a change in the financial condition of the company but instead is simply claiming loss of profits from the jobs for which it would have won the bid, but for Defendants conduct." ECF No. 51, at 13. Crom was directed to provide a list of all jobs it contends it lost as a result of the activities alleged in this case as well as an estimate of its resulting damages. The Magistrate Judge's Order further directed that Crom would be permitted to supplement this list as the case proceeded in the event additional projects were discovered relevant to the damages calculation. *Id.*

had not competed. The general contractor for the Rainbow City project stated that

PreCon Corporation submitted the second lowest bid, and in fact, Crom's bid was

the highest. ECF No. 59-27. Similarly, the general contractor on the San Antonio

project stated that the next lowest bid for that contract was submitted by DN Tanks,

and again, Crom's bid was the highest. ECF No. 59-28.

Crom did not present evidence to challenge these affidavits but instead

responded to the summary judgment motion by presenting two new damages

affidavits. Tallmadge E. Mincey, a Co-President of Crom, stated by affidavit that in

the first quarter of 2016, Preload began informing customers it would be driving

down the market prices for PCT tanks in the Southeastern United States and that

Preload's low bid on the Rainbow City project in April 2016 had the effect of driving

down bids by all competitors, which has harmed Crom.[17] ECF No. 60-15. Also by

affidavit, Jeff Pomeroy, Crom's Chief Financial Officer, stated that starting in the

second quarter of 2016, Crom was forced to reduce its bid prices for PCT projects

---

[17] Mincey also stated that draft meeting minutes from an ACI 372R Tank Committee meeting in Milwaukee, Wisconsin, showed that Bacon attended an April 19, 2016, meeting, shortly after her employment with Preload and close in time to the bidding on the Rainbow City project. Presumably, this is offered to rebut evidence that she was in Japan at that time. In reply, Defendants submitted evidence of her plane ticket and passport showing she was in Japan. The Court concludes that this dispute of fact is not material because, regardless of whether Bacon was at a meeting in Wisconsin or with her family in Japan when the Alabama bid occurred, nothing but speculation connects Bacon to Preload's PCT bidding process for that or any PCT project.

due to newly competitive PCT pricing by Preload, which resulted in damages from reduced profits as well as lost profits. ECF No. 60-16. He referenced four other projects where Preload's participation impacted Crom adversely—Paducah, Kentucky (Crom lost); Lake Charles, Louisiana (Crom lost); Lexington, Kentucky (Crom won but with a lower profit margin), and Morristown, Tennessee (Crom won but with a lower profit margin). According to Pomeroy, in each instance, Preload caused Crom either to lose the contract award or to lose profits by winning the contract but with a lower bid due to Preload driving down pricing generally. Pomeroy stated that based on these projects, Crom lost more than $900,000 in profits between April 1, 2016, and March 17, 2017, "due to newly competitive PCT project pricing from Preload."

In reply, Defendants presented an affidavit by Harvey, offering additional details to rebut the inference that Preload caused Crom's alleged damages related to the projects identified in Pomeroy's affidavit.[18] Harvey stated that as to the Paducah, Kentucky project, which Crom lost, Preload was not the low bidder either; as to the

---

[18] Defendants also move to strike these new affidavits, arguing that Mincey's affidavit shows a lack of personal knowledge and relies on hearsay and that Pomeroy's affidavit amounts to an untimely disclosed new damages theory, asserting for the first time that Preload has driven down the market for all competitors. The Court has considered the affidavits and finds it unnecessary to strike them because, as discussed *infra,* the evidence does not show a causal link aside from speculation between Bacon's employment with Preload and Crom's alleged lost profits.

Louisiana project, Crom's bid had been rejected; as to the project in Lexington, Kentucky, Crom's Type II tank won the contract over Preload's bid for a Type III tank; and Preload had not participated in the Tennessee project that Crom won. Crom presented no evidence to rebut Harvey's affidavit on these details.

## II.     Discussion

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing on the record that there is no genuine dispute of fact and that the plaintiff has failed to establish an element essential of the claim.  *See Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313 (11th Cir. 2007); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If this burden is satisfied, then the nonmoving party must go beyond the pleadings and "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.  The Court views all evidence in the light most favorable to the party opposing the motion and draws all reasonable inferences in favor of the non-movant "to the extent supportable by the record." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)). Moreover, "credibility determinations, the weighing of evidence, and the drawing of inferences from the facts" are matters left to the jury. *Graham v. State Farm Mut.*

*Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). There is no genuine issue for trial, however, and summary judgment is proper, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.      Breach of the Non-Compete Agreement

Under Florida law, a breach of contract claim requires proof of (1) a valid contract; (2) a material breach and (3) resulting damages. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999); *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2d DCA 2006). Like any contract, the interpretation of a covenant not to compete is a matter of law.[19] *Envtl. Servs., Inc. v. Carter*, 9 So. 3d 1258, 1263 (Fla. 5th DCA 2009). Courts construe a non-compete agreement in favor of providing reasonable protection to legitimate business interests of the party seeking enforcement, not narrowly against the drafter. Fla. Stat. § 542.335(1)(h). And as with all contracts, courts must construe the terms "as a whole and give effect, where possible, to every provision of the agreement." *Anarkali Boutique, Inc. v. Ortiz*, 104 So. 3d 1202, 1205 (Fla. 4th DCA 2012).

---

[19] "It is well established law that when a court is interpreting a contract, clear and unambiguous terms should be given their plain meaning." *Steritech Grp., Inc. v. MacKenzie*, 970 So. 2d 895, 898 (Fla. 5th DCA 2007).

In Florida, a non-compete provision is valid provided the contract is "reasonable in time, area, and line of business." *See* Fla. Stat. § 542.335 (providing a framework for analyzing and evaluating restrictive covenants in employment contracts). The agreement must be in writing, and the enforcing party bears the burden to "plead and prove" that a "legitimate business interest[]" justifies the restriction and also that the restriction is "reasonably necessary to protect the legitimate business interest." *See* Fla. Stat. § 542.335(1)(a),(b),(c). After establishing a *prima facie* case, the burden shifts to the opposing party to prove that the restriction "is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest." *Id.* § 542.335(1)(c); *see also Envtl. Servs*, 9 So. 3d at 1263. Reasonableness is a question of fact for the trial court. *See Crom Corp. v. Harvey,* No. 1:12cv141SPMGRJ, 2012 WL 13018540, at *4 (N.D. Fla. Nov. 29, 2012); *see also Whitby v. Infinity Radio, Inc.*, 951 So. 2d 890, 897 (Fla. 4th DCA 2007). The statute also creates several rebuttable presumptions in regards to the reasonableness of a restriction. For instance, a restraint greater than two years in duration is presumed unreasonable, unless it applies to trade secrets, in which case a five-year presumption applies. *See* Fla. Stat. § 542.335(1)(d), (1)(e). Also, if a restrictive covenant is found to be valid and violated, the violation creates a rebuttable presumption of irreparable injury that may be enforced by way of

injunctive relief or "any appropriate and effective remedy." *See* Fla. Sta. § 542.335(1)(j); *see also TransUnion Risk and Alternative Data Solutions, Inc. v. Challa*, 676 F. App'x. 822, 826 n.3 (11th Cir. Jan. 12, 2017) (unpublished) ("Whether the employee successfully rebuts the presumption of irreparable harm is a fact-sensitive inquiry that will vary from case to case.").

Bacon argues first that the restrictive covenant is not enforceable because it expired in 2013, three years after the end of her internship, relying on *Sanz v. R.T. Aero,* 650 So. 2d 1057, 1059 (Fla. 3d DCA 1995). The Court disagrees and finds *Sanz* distinguishable on its facts. In *Sanz*, the court determined that a non-compete clause within a written contract for a set number of years had expired where the employee had not been terminated before the end of the contract term. *Id.* The court also determined that the non-compete clause was not revived by the fact that the employee continued to work under an oral arrangement, reasoning that the restriction only would have applied if the employee had been terminated during the life of the written employment agreement, which did not occur. *Id.* Here, by contrast, Bacon's employment contract was not limited to a term of years, and her Non-Compete Agreement expressly provided that the three-year restriction would begin on the termination of her employment, not her internship. Therefore, the Court finds that *Sanz* is not controlling.

CASE NO. 1:16cv238-MCR/GRJ

Bacon's argument that her Non-Compete Agreement expired in 2013 is premised on the faulty assumption that the three-year restriction was triggered by the termination of her internship, which was part-time, lasted during semesters, and likely ended with her graduation in May 2010. This is belied by the Agreement's terms, which provide that the three-year restriction commences "with the date of the Employee's termination of *employment* with the Company." ECF No. 59-3 (emphasis added). The term "employment" is not defined in the Agreement or otherwise limited to Bacon's status as an intern, and the facts show that Bacon's employment with Crom in fact did not terminate when her internship ended. Instead, in April 2010 (before the internship ended), Crom offered her a full-time position. The practical impact of Bacon's acceptance was that her status as an intern changed to that of a full-time employee, and as a result, her employment with Crom *continued* and she moved seamlessly into a new full-time position in May 2010, with full benefits and increased duties.[20] Also, considering the Agreement as a whole, it includes a consideration clause, stating that consideration for the restriction is based in part on "future or continued employment of the Employee by the Company." This

---

[20] Crom's characterization of this as a "promotion" is not entirely accurate but it is not far from the mark. Bacon technically was a "new hire" as a staff engineer, as she contends, but the effect of this change on her status as an employee was the same as a promotion—she was still employed by Crom. This is confirmed by the unrebutted testimony of Marquis-Torrez.

confirms that the Non-Compete Agreement was intended to apply in the event of continued employment.

The fact that Crom could have required Bacon to sign a new Non-Compete Agreement when she started full time, as stated in the 2010 Offer, does not by implication terminate her pre-existing agreement. It was clear that she would be bound by a non-compete agreement as a full-time employee, and there is no language terminating any pre-existing agreement. There was no reason for Bacon or Crom to think that the Non-Compete Agreement on file from 2007 had expired by reason of her decision to continue working with Crom. Thus, on the undisputed facts, although Bacon's internship ended when her status changed to full-time employee, the three-year period during which she was restricted from working for a competitor was triggered by her termination of employment with the company in 2016, not her continued employment in 2010. *See Anarkali Boutique*, 104 So. 3d at 1205 (noting that employment with the company had not terminated despite a change in the worker's status from employee to independent contractor, and to conclude otherwise "would lead to an absurd conclusion").

Bacon next argues that the Non-Compete Agreement is unenforceable because it is not justified by a legitimate business interest. "Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and

unenforceable." Fla. Stat. § 542.335(1)(b). A "legitimate business interest" includes "trade secrets," as defined in Fla. Stat. 688.002(4), as well as other "[v]aluable confidential business or professional information" and "[e]xtraordinary or specialized training." Fla. Stat. § 542.335(1)(b); *see also Colucci v. Kar Kare Auto. Grp., Inc*., 918 So. 2d 431, 439 (Fla. 4th DCA 2006) ("Protectable information includes that which is unique in the industry and confidential."). The term "trade secrets" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process that" has "independent economic value" from not being generally known and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Fla. Stat. § 688.002(4). However, not all information that a business deems confidential is sufficient to justify a restrictive covenant that precludes employment with a competitor. *See Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1234 n.11 (11th Cir. 2009) (noting information on "the mere identity of [the employer's] clients or pricing terms" on projects "may not be sufficient to justify a restrictive covenant"); *GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1335 (M.D. Fla. 2010) (same). Also, a restriction may not exist solely as a tool to eliminate competition or merely to prevent an employee from "working with a competing employer in any capacity." *Edwards v. Harris*, 964 So. 2d 196, 198 (Fla. 1st DCA 2007). Instead, the restriction

must exist to prevent the employee "from engaging in activities harmful to the [former employer's] legitimate business interest." *Id.*

Bacon argues that Crom lacks any legitimate business interest in restricting her from working for Preload in the LNG tank industry because Crom's business does not involve the design or construction of LNG tanks. But Crom undoubtedly has shown a legitimate business interest in restricting employees from "employment with any competitor of [Crom] engaged in the present or anticipated business of [Crom]" under ¶ 5. Crom's business involves PCT design and construction. Despite the fact that Crom does not compete in the LNG industry, the record shows that Preload does competes with Crom in the PCT industry and that Bacon's PCT design knowledge is useful in her LNG design work at Preload. Bacon gained her specialized knowledge related to PCT design at Crom, where she also used and helped develop confidential, proprietary and potentially trade secret computer design programs and business processes. Crom has a legitimate need to protect that PCT design-related information and thus has articulated a *prima facie* legitimate business interest in restricting Bacon from working for a PCT design and construction competitor.

The burden then shifts to Bacon to establish that the contractually specified restriction is overbroad, overlong, or otherwise not reasonably necessary to protect

CASE NO. 1:16cv238-MCR/GRJ

Crom's established legitimate business interest. If so, the Court must modify the terms of the restriction and "grant only the relief necessary to protect [that] interest." Fla. Stat. § 542.335(1)(c). As noted above, reasonableness is a question of fact for the trial court. *See Proudfoot*, 576 F.3d at 1237; *Whitby*, 951 So. 2d at 897. Bacon contends that the undisputed facts show (1) the restriction is overbroad because Crom's legitimate business interest does not encompass the LNG tank industry; (2) the three-year restriction is presumptively unreasonable; and (3) the lack of any geographic restriction is unreasonably overbroad. She further argues that she would not be found in violation of any reasonably modified restriction. For the following reasons, the Court finds that a question of fact exists as to the reasonableness of the non-compete clause (that is, the three-year employment restriction of ¶5, which lacks a geographical boundary).

Bacon's first argument, that the restriction is overbroad because she works only on LNG tanks at Preload and it is undisputed that Crom does not build or design LNG tanks, involves credibility calls that are not appropriate for summary judgment. She testified that her work is confined to LNG design projects in states in the northeast, and she has only worked on LNG projects in Pennsylvania and Alaska, where Crom does no business. But in response, Crawford's testimony indicates that the restriction is necessary to protect Crom's legitimate business interest because the

LNG tank designed with prestressed concrete uses PCT design and ACI 372 criteria, "which is what Crom Corporation specializes in,"[21] ECF No. 60-1, at 131, and moreover, Crom competes with Preload in the PCT industry in the Southeastern United States. Further, the record reflects that Bacon's job description with Preload includes the analysis and design of prestressed concrete tank structures as an essential element, and Harvey testified for Preload that, since he has been CEO, Preload has not designed or constructed any LNG storage tank that did not include a prestressed concrete tank, ECF No. 60-6, at 182, which is what Bacon designed at Crom. Given the overlap of these designs and the specialized design and computer knowledge Bacon gained from Crom, and drawing all reasonable inferences in Crom's favor at this stage, a reasonable fact finder could conclude that restricting Bacon's work on LNG tanks at Preload is reasonably necessary to protect Crom's legitimate business interests in PCT design. On this record, the Court finds that credibility will be critical, which presents a question of fact. *See Whitby*, 951 So. 2d at 897 (testimony regarding legitimate business interests and the broadness of a non-

---

[21] Certainly the standard design specifications of ACI 372 and design aspects printed in Crom's promotional business brochures are not confidential. *See Colucci v. Kar Kare Auto. Grp., Inc.*, 918 So. 2d 431, 439 (Fla. 4th DCA 2006) (noting protectible information must be unique in the industry and confidential, not commonly known). However, the record shows that Crom has internal procedures and computer programs related to the design that are protectible and that Bacon worked with and helped develop.

compete covenant "necessarily gives rise to questions of credibility" determinations, which are inappropriate on summary judgment).

Turning to the three-year restriction, Bacon argues it is presumptively unreasonable under Florida law, which presumes that a restriction of more than two years is unreasonably long. *See* Fla. Stat. § 542.335(1)(d). Again, a question of fact exists on this record. For a restriction predicated on protecting trade secrets, five years or less is a presumptively reasonable length. *See* Fla. Stat. § 542.335(1)(e). Crom's computer design programs could qualify as a trade secret, *see* Fla. Stat. § 688.002(4), and Bacon's access to them and special knowledge gained through helping to develop them raise a question of fact as to the reasonableness of the restriction and Crom's concerns for protecting them, even in the absence of evidence that she actually improperly disclosed them. Also, even if the programs are not trade secrets but are confidential business information, restricting Bacon's use of her highly specialized PCT design training, which was not available through her education but only through Crom, and her knowledge of Crom's confidential information, to benefit a direct PCT competitor could be sufficient to justify rebut the two-year presumption. Thus, there is a question of fact as to the reasonableness of the length of the restriction.

Bacon also argues that the restriction is nevertheless unreasonably overbroad because it lacks any geographical boundary. Again, this presents a question of fact. The reasonableness in scope of a geographic restriction is a question of fact. *See Proudfoot Consulting,* 576 F.3d at 1237. A world-wide restriction does appear to be overly broad given that Crom primarily does business in the Southeastern United States and given Crawford's testimony, in which he was unable to confirm that the world-wide list of states and countries he provided actually included places where Crom does business.[22] Nonetheless, this is not grounds to find the Non-Compete Agreement invalid but rather for a reasonable modification based on the facts, which, again, turns on credibility determinations. *See Env'l. Servs.,* 9 So. 3d at 1264. Also, determining whether a modification is reasonable or whether Bacon has violated a reasonably modified restriction will require the resolution of competing inferences regarding Preload's use of Bacon's specialized knowledge and experience in PCT

---

[22] Crawford provided an affidavit with a list showing that from June 27, 2013 through June 27, 2016, Crom's business had a world-wide geographic span, including 27 states across the continental United States and several countries in North and South America, as well as Asia and Africa. See ECF No. 60-2. In a follow-up video deposition, however, Crawford admitted that these were locations where Crom had "pursued business opportunities," ECF No. 60-3 (Video Depo. Nov. 20, 2017), but he was unable to say whether, since 2013, Crom had built tanks in every location listed, whether Crom was licensed in every location listed, or even whether Crom had bid on a project in every location listed in his affidavit.

design.[23]   Finally, even finding that a reasonably modified restriction has been violated does not guaranty relief because the presumption of irreparable harm is rebuttable, *see Challa*, 676 F. App'x at 826; *see also Passalacqua v. Naviant, Inc.*, 844 So. 2d 792, 796 (Fla. 4th DCA 2003) (presumption of irreparable harm is rebuttable), requiring yet another "fact-sensitive inquiry that will vary from case to case," for reasons already stated. *See Challa*, 676 F. App'x at 825-26 & n.3 (noting that the presumption was rebutted by credible testimony that the former employee was unlikely to use specialized knowledge against the employer); *see also* Fla. Stat. § 542.335(1)(j).   Bacon is therefore not entitled to summary judgment on Count I for breach of the three-year restriction in ¶5 of the Non-Compete Agreement.

## B.   Misappropriation

The remainder of Crom's claims against Bacon and Preload depend at least in part on some proof that Bacon has misappropriated legally protected trade secrets or

---

[23] Bacon presented evidence that other non-compete agreements signed during the period from May 2010 through January 2016 included narrower restrictive covenants, limited to two years and a 100 mile geographic scope.   Also, Harvey's 2006 non-compete agreement with Crom restricted him from competition for two years and in specific states of Florida, Georgia, South Carolina, North Carolina, Virginia, Maryland, Alabama, Mississippi, Louisiana, Kentucky, Tennessee, West Virginia, Arkansas, and the District of Columbia.   Even considering that these could be reasonable restrictions, determining whether Bacon is in violation will depend on whether there is a danger that Preload could apply her knowledge and PCT design experience to its competition for PCT projects in those areas.

CASE NO. 1:16cv238-MCR/GRJ

confidential information.[24]   The Non-Compete Agreement prohibited Bacon from disclosing for her own benefit "any trade secrets or confidential information of any technical, commercial or other nature" pertaining to Crom's business that Bacon acquired during her employment with Crom.  *See* ECF No. 59-2, ¶ 3.  To enforce a nondisclosure restriction, there must proof that an actual trade secret or confidential or proprietary information was taken.  *See generally Passalacqua*, 844 So. 2d at 796-97 (reversing a temporary injunction where no confidential data or unique or proprietary material, method or technique was identified to justify the restriction). In addition to this Agreement, an employee's common law duty of loyalty to an employer prohibits disloyal acts in anticipation of future competition, such as "using confidential information acquired during the course of h[er] employment."  *Fish v. Adams*, 401 So. 2d 843, 845 (Fla. 5th DCA 1981).

Bacon and Preload argue they are entitled to summary judgment on all misappropriation claims because Crom has presented only speculation to support its

---

[24] Count I, breach of the Non-Compete Agreement, alleges misappropriation and failure to return materials as bases for the breach, in addition to the 3-year employment restriction, and Count II alleges Bacon breached her duty of loyalty by misappropriating and conspiring to misappropriate Crom's confidential and trade secret information.   Similarly, Count III, asserting tortious interference, and Counts IV and V, alleging civil conspiracy and unfair competition against Preload and Bacon, all include allegations of misappropriation.  And Crom's claim for damages is premised on Bacon having misappropriated trade secrets, confidential information, or proprietary information, and given it to Preload to harm Crom's business interests.

assertion that Bacon took, disclosed, retained, or actually used Crom's confidential or trade secret information to benefit Preload. The Court agrees. Although Crom has identified that Bacon had *access* to Crom's trade secrets, confidential information, and business processes during her employment, especially the dome form programs, pile floor programs, and C Note programs relating to the design and construction of PCTs, which undoubtedly justified a restriction on their disclosure (¶3), there is no record evidence to support a reasonable inference that Bacon took or used those programs at Preload. Crom relies on its forensic Report of Bacon's work computers, which identified files that had been "accessed" during the last few months of her employment (and thus, which Bacon *might* have transferred to personal storage devices), and on Crawford's examination of those files. In an interrogatory, Crawford stated that Bacon had "absconded" with broad categories of information, such as "Estimating program and project quotes," "Settlement calculations," "Crom pricing information," "Drafting documents and drawings," "Project quotes," "Project pricing information," "project bid information," and "Tank design and formwork programs," among others. ECF No. 59-24. But he testified that he prepared this list based on file lists attached to the forensic Report. ECF No. 60-1, at 121. As noted above, the forensic Report expressly stated that it did <u>not</u> provide a factual link between any file "accessed" and any file actually

downloaded or transferred to a personal device. Instead, the report recommended further analysis to determine whether there was a link, but no further analysis is in the record.

The record shows that Bacon discovered some Crom-related files in her personal devices during this litigation.[25] Although those personal devices have been returned to Crom, Crom has not presented evidence to identify the nature of any specific document or file that Bacon retained—inadvertently or not.[26] Absent any report or testimony of the contents or nature of the files retained on Bacon's personal storage devices, it would be pure speculation (not a reasonable inference) to say that those files were of a confidential nature. The one Crom file found on her Preload laptop was a list of engineers and their licensing dates, including her own, which cannot be considered confidential to Crom's business interests or a trade secret. Because Crom has been in possession of the electronic data since March 2017, its failure to identify with competent evidence any particular file that Bacon failed to

---

[25] At Crawford's deposition taken on March 20, 2017, he testified only to his review of the list of files that were attached to the forensic Report (that list is not attached to the Report in evidence). Defense counsel provided Bacon's personal storage devices to Crom on March 24, 2017. *See* ECF No. 60-10.

[26] By way of explanation, Bacon testified that saving any such materials was inadvertent. The Court acknowledges that whether it was intentional or inadvertent is a question of fact and credibility cannot be resolved on summary judgment.

return which amounted to legally protected confidential, trade secret, or proprietary information is fatal to its claims of misappropriation and violation of ¶3 of the Non-Compete Agreement.[27]

The Non-Compete Agreement also required Bacon, on her termination, to return to Crom all records, documents, processes, methods, and sales information in her possession that she used or that pertain to any activities of the company, including her work. *See* ECF No. 59-2, ¶ 4. While Bacon's failure to return all

---

[27] Crom provides only argument in opposition to the motion, not evidence. For instance, Crom argues that Bacon "accessed 113,141 Crom files in the hours before Mr. Barrio arrived at her house [on March 25, 2016] to retrieve Crom's property from her." ECF No. 60 at 8. As support for this assertion, Crom cites page nine of the forensic report, but the report does not support the assertion. To the contrary, the only timed event noted in the report is found on page six, and identifies one file being "accessed" thirty minutes before the computer was secured by Barrio. ECF No. 60-7 at 6. Crom argues that "Bacon accessed and downloaded hundreds of thousands of Crom's confidential files at a steadily-increasing pace until just minutes before Crom's representative arrived at her residence to retrieve Crom's property." ECF No. 60, at 31. No evidence is cited to support this; the forensic Report does show that directory listings of filenames on the hard drives of the Crom computer contained hundreds of thousands of files but does not show that Bacon "downloaded" or transferred them to a personal device, although the Report suggests this could have occurred. Crom also argues that Bacon "admitted in her deposition that she had retained Crom's confidential files" but cites nothing in the record to support the assertion. Similarly, during Bacon's deposition, Crom's attorney repeatedly referenced the information as confidential but Bacon did not speak to the content of the files other than to admit the files were included Crom-related information. The manner in which Crom's attorney characterizes the files is not evidence. It is undisputed that Bacon retained some Crom files, which have been returned, but the nature of those files has not been established by evidence. Moreover, "[j]udges are not like pigs, hunting for truffles buried in briefs," *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), and "[l]ikewise, district court judges are not required to ferret out delectable facts buried in a massive record." *Chavez v. Sec'y Fla. Dept. of Corrs.*, 647 F.3d 1057, 1061 (2011). Crom's failure to support its argument with record cites results in a failure to successfully rebut the Defendants' summary judgment argument.

materials belonging to Crom after her termination violated ¶4 of the Non-Compete Agreement, regardless of whether that information was designated as confidential, trade secret, or proprietary information, the record reflects that Bacon has returned all items that were in her possession. Therefore any request for injunctive relief based on a violation of ¶4 of the Non-Compete Agreement is moot, and any damages claim fails for the reasons stated below.

## C. Tortious Interference, Unfair Competition, Civil Conspiracy

To the extent any of Crom's claims survive, all of which are premised on breach of the Non-Compete Agreement, Defendants argue that the claims nonetheless fail due to Crom's inability to show resulting damages.[28] The Court agrees. Crom claims it has suffered damages in the form of lost profits. Under Florida law, although "uncertainty as to the precise amount of the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages," still, "causation must be proved with reasonable certainty." *Proudfoot*, 576 F.3d at 1243 (reversing a damages award where it was not found that absent the breach of the non-compete, the plaintiff would have obtained the project). Injunctive relief is favored as a remedy for breach of a restrictive covenant because

---

[28] As noted above, there is a question of fact on the claim of breach of the Non-Compete Agreement's employment restriction.

CASE NO. 1:16cv238-MCR/GRJ

of the inherent difficulty of determining what damage was actually caused. *Id.* Disgorgement of profits is not permitted for breach of contract. *Id.* at 1245. Crom's claims of tortious interference, unfair competition, and civil conspiracy all rely on the alleged breach of the Non-Compete Agreement and require proof of damages.[29] Thus, there must be some evidence to link the breach of the Non-Compete Agreement to an actual business loss of Crom.

Crom asserts that the actions of Bacon and Preload with regard to the breach of Bacon's Non-Compete Agreement gave Preload an unfair advantage that caused Crom damages in the form of lost profits. More specifically, Crom argues that, since April 2016 (when Bacon began working with Preload), Preload has reduced its bids, resulting in Crom losing four subcontract bids for prestressed concrete tank projects

---

[29] To prove tortious interference with a business relationship, there must be evidence of: (1) the existence of a business relationship, under which the plaintiff has legal rights; (2) knowledge of the relationship by the defendant; (3) intentional and unjustified interference with that relationship by the defendant; and (4) resulting damage to the plaintiff. *Palm Beach County Health Care Dist. v. Professional Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009); *Wackenhut Corp. v. Maimone*, 389 So. 2d 656 (Fla. 4th D.C.A. 1980). This tort is a type of unfair competition, and where an unfair competition claim is based on tortious interference, it has the same elements as the tortious inference claim. *Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982); *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1353 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008). A civil conspiracy under Florida law requires proof of: "(1) an agreement between two or more parties[;] (2) to do an unlawful act; (3) doing an overt act to further the conspiracy; and (4) damage to the plaintiff as a result of the acts done under the conspiracy." *GolTV, Inc. v. Fox Sports Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1312 (S.D. Fla. 2017); *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).

(Rainbow City, San Antonio, Paducah, and Lake Charles), and losing profits on two other projects that Crom won but nonetheless argues that its profit margin was reduced due to the effect of Preload's reduced bidding in the market. Crom argues that there can be only one reason for Preload's "sudden ability" to reduce its PCT bid prices, namely, that Preload was using confidential information from Bacon. Absolutely no evidence supports this supposition, however.

First, as noted, there is no evidence of misappropriation and only speculation to link Bacon's employment, design experience or knowledge of Crom's programs to Preload's lower bids on PCT projects. Importantly, no evidence suggests that Bacon was involved in Preload's PCT bidding process on these projects, and even assuming her knowledge of Crom's PCT design programs could have been revealed to Preload, no evidence gives rise to a reasonable inference that this knowledge would have reduced Preload's bids or prices. Defendants presented uncontroverted evidence from the general contractors on the Rainbow City and San Antonio projects, showing that Crom was not the second lowest bidder and thus would not have won the bid in Preload's absence. ECF Nos. 59-27, 59-28. Harvey's affidavit of additional facts was also unrebutted, showing that that Preload's bids on the four other projects discussed by Pomeroy were not directly responsible for Crom's

losses.[30]  ECF No. 64-1.  It is therefore undisputed that, even without Preload in the bidding, Crom would not have won the subcontracts.  There is no issue of fact from which it can be inferred that Crom's alleged losses are attributable to Bacon's employment with Preload.[31]

Accordingly:

1.    Defendants' Motion for Summary Judgment, ECF No. 59, is **GRANTED in part** and **DENIED in part** as follows:  **DENIED** as to the breach of ¶ 5 of the Non-Compete Agreement to the extent equitable relief may be available and **GRANTED** as to all other claims.

2.    The parties are directed to confer and file a notice within fourteen (14) days, advising the Court on their positions as to (a) whether an injunction hearing should be scheduled, and what, if any, equitable relief would be available at this time due to the alleged breach and the passage of three years, and (b) whether the remaining issue is moot by the passing of three years during which Crom did not

---

[30] Because the Court has considered the affidavits of Mincey and Pomeroy and finds that they add nothing to establish a causal link between Bacon's employment and Preload's bids, the Motion to Strike will be denied.

[31] The allegations of the complaint also assert that Preload encouraged other Crom employees to breach their Non-Compete Agreements and duties of loyalty, conspired to do so, and interfered with Crom's business relationship with Bacon.  These claims all fail for Crom's failure to put forward evidence of damages resulting from these acts.

request a temporary restraining order or preliminary injunction to preclude Bacon from working for Preload.

3.     Defendants' Motion to Strike, ECF No. 65, is **DENIED**, and consequently no sanctions will be ordered.

**DONE AND ORDERED** this 31st day of March 2019.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**